UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | No. 1:26-CR-00385-DAE |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | |
| | § | |
| RYAN THOMAS GRIFFIN, | § | |
| | § | |
| *Defendant*. | § | |

ORDER DENYING DEFENDANT'S MOTION TO STRIKE SURPLUSAGE AND DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Before the Court are two motions filed by Defendant Ryan Thomas Griffin ("Defendant" or "Griffin"): a Motion to Strike Surplusage filed on July 31, 2026 (Dkt. # 34), and a Motion to Dismiss the Indictment filed on August 17, 2026 (Dkt. # 39). The Government filed responses in opposition to these motions on August 27, 2026. (Dkts. ## 40, 41.) The Court held a hearing on September 3, 2026. After careful consideration of the memoranda and exhibits filed in support of and in opposition to the motions, as well as the arguments of counsel at the hearing, the Court—for the reasons that follow—**DENIES** Defendant's Motions.

BACKGROUND

On July 21, 2026, Defendant was indicted on four counts of Interstate Transmission of Threatening Communication in violation of 18 U.S.C. § 875(c).

(Dkt. # 27.) The counts were based on, and quoted, statements posted by Defendant on the social media platform Gab. (Id.) The statements included in the Indictment are as follows:

- *I'm just a random nobody in the US and I can pick any synagogue I want and go postal on it and the president will be visiting the place the next week to pay respects to his real masters. Your theater kid shit will be easy to play and as soon as I get an organized group of men willing to act on it we are going after your ass zog*[1] *trash. I don't care about trump, and I wouldn't even live to see him there most likely assuming I jihaded any place, but the team would have all your moves laid out in advance and they'd be waiting. The first attack would just be the bait. And then we'd hit you again at the funeral once the more important people showed up to grift.*

- *Zionists do not have the authority to lecture me on sexual morals or anything else. They're criminals and I am going to kill them.*

- *If I'm NEVER getting a family or a house in shithole America what else do I have to do better than KILL my state representatives? God that sounds awesome. I want them to die so bad. Like I'm looking up what is their schedule, where are they and when so I can potentially kill them. That's how FUCKING PISSED I am about America ripping me off.*

- *My Goal for the next 10-20 years is to get hot girl I can have kids with, 10 acres of land to live on, stable income to support my family. And if I can't get that as upper middle class white collar educated heritage US guy then I am going to attack the federal government and kill their employees or the US military. Right now – looking like terrorism is my better option. I like JD Vance meme. It's not a joke for me. We are going to fucking kill you. You are going to make this deal available to me or I am going to start building bombs.*

(Dkt. # 27.)

[1] "Zog" is an acronym for "Zionist Occupation Government." (Dkts. ## 1, 3.)

The Grand Jury also made special findings in the Indictment regarding two of the charged counts. First, regarding the statement "I can pick any synagogue I want and go postal on it," the Grand Jury alleged that Griffin "intentionally selected any synagogue as the object of his threat because of the actual and perceived religion of persons associated with synagogues." (Id. at 1–2.) The second special finding was that Griffin "intentionally selected the victims of his threat because of the actual and perceived religion of such persons," regarding his statement that "Zionists do not have the authority to lecture me on sexual morals or anything else. They're criminals and I am going to kill them." (Id. at 2.) On July 28, 2026, Defendant entered a plea of Not Guilty. (Dkt. # 33.)

On July 31, 2026, Defendant filed the first of the two motions at issue here, his Motion to Strike Surplusage, which seeks to remove the Grand Jury's two special findings from the Indictment. (Dkt. #34 at 1.) Defendant argues that the special findings ask the jury to consider evidence of religious hostility, which is not an element of the offense charged against him. (Id. at 2.) Although Defendant acknowledges that these special findings do relate to a sentencing factor under the United States Sentencing Commission Guidelines, Section 3A1.1 ("Hate Crime Motivation or Vulnerable Victim"), Defendant maintains that this enhancement only applies in cases where proof of the charged offense inherently involves proof of animus toward a protected group. (Id. at 5–7.) Thus, because the offense

charged here does not require proof of religious hostility, Defendant contends that the Indictment's special findings are irrelevant and would unduly inflame the jury. (Id. at 2–3.)

On August 17, 2026, Defendant filed the second of the two motions at issue here, his Motion to Dismiss Indictment. (Dkt. # 39.) Defendant argues that none of the statements in the Indictment are "true threats" because the statements are "hyperbolic, conditional, and abstract." (Id. at 1, 7.) Defendant thus contends that the Government seeks to prosecute him for speech that is constitutionally protected as a matter of law. (Id. at 9.) In the alternative, Defendant argues that the statutory offense he has been charged with, 18 U.S.C. § 875(c), is unconstitutionally vague and overbroad because it fails to provide notice to ordinary individuals of forbidden conduct and punishes a substantial amount of protected speech. (Id. at 13–15.)

The Government filed responses in opposition to Defendant's motions on August 27, 2026.[2] First, regarding Defendant's Motion to Strike Surplusage, the Government argues that the special findings are properly included in the Indictment to give Defendant notice of the allegations against him. (Dkt. # 40 at 1,

[2] The Court notes that, according to Local Rule CR-47, the Government's response to Defendant's Motion to Strike Surplusage was untimely as it was not filed within eleven days of service of Defendant's motions. Even so, the Court considered the Government's response as part of its disposition of the motion.

3.) Further, the Government argues that these special findings are not prejudicial and in fact they are necessary because Section 3A1.1(a) of the Sentencing Guidelines requires the jury to determine the applicable enhancement beyond a reasonable doubt. (Id. at 2.)

Second, regarding Defendant's Motion to Dismiss Indictment, the Government argues that Defendant's statements from his Gab posts are direct and specific enough to qualify as true threats. (Dkt. # 41 at 5–7.) The Government also contends that a jury must resolve the question of whether Defendant's threats can reasonably be understood as conveying a sense that violence will follow. (Id. at 10–11.) The Government also argues that 18 U.S.C. § 875(c) is not unconstitutionally vague or overbroad because it provides ordinary individuals with notice of unlawful conduct and because it does not criminalize, as Defendant suggests, all expressions of political hyperbole. (Id. at 12–14.)

## LAW AND ANALYSIS

### I. Motion to Strike Surplusage

#### A. Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) provides that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment must "inform the accused of the nature of the charges against him, with such specificity

and particularity that the accused is enabled to undertake and prepare an adequate defense." United States v. Johnson, 476 F.2d 1251, 1255 (5th Cir. 1973) (quoting United States v. Levinson, 405 F.2d 971, 977 (6th Cir. 1968)). This includes alleging "every element of the crime of which [the defendant] is accused." United States v. Ramos, 537 F.3d 439, 459 (5th Cir. 2008) (quoting United States v. Boyd, 885 F.2d 246, 249 (5th Cir. 1989)).

Rule 7(d) further provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). Surplusage can include the "allegation of additional facts beyond those which compromise the elements of the crime." United States v. Valencia, 600 F.3d 389, 432 (5th Cir. 2010). The Advisory Committee Notes to the Federal Rules of Criminal Procedure explain that Rule 7(d) is designed to "protect[] the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." Fed. R. Crim. P. 7(d) advisory committee's note to 1944 rules. The Fifth Circuit has accordingly held that "[f]or language to be struck from an indictment, it must be irrelevant, inflammatory, and prejudicial." United States v. Graves, 5 F.3d 1546, 1550 (5th Cir. 1993) (citing United States v. Bullock, 451 F.2d 884, 888 (5th Cir. 1971)).

This "exacting" standard is a high bar to clear. See Bullock, 451 F.2d at 888. "The inclusion of clearly unnecessary language . . . that could serve only to

inflame the jury, confuse the issues, and blur the elements necessary for conviction surely can be prejudicial." Id.; see also United States v. Williams, 203 F.2d 572, 574 (5th Cir. 1953) ("Indirect expressions, implied allegations, argumentative statements, and uncertainty due to generalizations in language, are defects in an indictment that may be fatal if struck at by a timely motion before trial.") Even so, "[w]here information in an indictment is sufficiently *relevant* to the charged offense, the court should not strike it, *no matter how prejudicial it may be*." United States v. Solomon, 273 F.3d 1108, 2001 WL 1131955, at *1 (5th Cir. 2001) (emphases added). For example, "[e]vidence suggesting a motive for a crime is relevant." Graves, 5 F.3d at 1550 (holding trial court did not abuse its discretion in denying request to strike the defendant's occupation from the indictment because "his occupation was relevant to prove the motive" of the charged conspiracy).

The offense Defendant is charged with committing, 18 U.S.C. § 875(c) ("Section 875(c)"), prohibits "transmi[tting] in interstate or foreign commerce any communication containing . . . any threat to injure the person of another." 18 U.S.C. § 875(c). The Fifth Circuit recently noted that because Section 875(c) plainly criminalizes speech, "[Section] 875(c) only reaches a 'true threat.'" United States v. Nformangum, No. 24-20515, 2026 WL 18900, at *2 (5th Cir. Jan. 2, 2026) (citing United States v. Morales, 272 F.3d 284, 287 (5th Cir. 2001)), *petition for cert. docketed*, No. 25-7259; see also Watts v. United States,

394 U.S. 705, 707 (1969) (per curiam) (explaining that "a statute . . . which makes criminal a form of pure speech . . . must be interpreted with the commands of the First Amendment clearly in mind"). A communication contains a "true threat" when "an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm." United States v. Burger, 170 F.4th 395, 401 (5th Cir. 2026) (per curiam) (quoting United States v. Jubert, 139 F.4th 484, 490–91 (5th Cir. 2025)).

The mens rea requirement for a conviction under Section 875(c) is two-fold. First, the defendant must have knowingly transmitted a communication. See Nformangum, 2026 WL 18900, at *4 (citing Elonis v. United States, 575 U.S. 723, 737 (2015)). Second, regarding whether the communication actually transmitted a "true threat," the government must prove that the defendant was at least reckless—that he "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." Burger, 170 F.4th at 404 (quoting Counterman v. Colorado, 600 U.S. 66, 69 (2023)); United States v. Towery, No. SA-20-CR-342-XR, 2022 WL 789332, at *3–4 (W.D. Tex. Mar. 14, 2022).

B. Analysis

Turning to Defendant's arguments in support of his Motion to Strike Surplusage, Defendant correctly points out that Section 875(c) itself does not

require proof of religious hostility. See Elonis, 575 U.S. at 743 (Alito, J., concurring in part and dissenting in part) (describing the proof required for a conviction under Section 875(c)). But the Fifth Circuit has explained that "[t]he mere fact that information in an indictment does not constitute an element of the charged offense does not require that it be stricken." Solomon, 273 F.3d 1108, 2001 WL 1131955, at *1. Rather, it is appropriate to strike language from an indictment when the language is "irrelevant, inflammatory, and prejudicial." Graves, 5 F.3d at 1550. The Court finds that this "exacting" standard has not been met in this case. See Bullock, 451 F.2d at 888.

First, evidence of Defendant's religious hostility would not be "irrelevant" to the offense charged because it could supply evidence of Defendant's state of mind, which is necessary to secure his conviction. For instance, evidence that Defendant harbored animosity towards the religious groups identified in his Gab posts may make it more probable that Defendant subjectively intended, or was at least aware, that members of those groups would feel threatened by his posts. See United States v. Jiang, No. 1:24-CR-65, 2025 WL 419531, at *11 (E.D. Va. Feb. 6, 2025) (citing Fed. R. Evid. 401). Second, the Court does not view the language in the Indictment as overly inflammatory or prejudicial. The Government will necessarily present the jury with evidence of Defendant's hostility towards Jewish persons as part of proving the charged offense, given that Defendant's Gab

posts plainly exhibit that hostility. Cf. United States v. Sherifi, 107 F.4th 309, 319 (4th Cir. 2024) (rejecting the defendant's argument that the Section 3A1.1(a) sentencing enhancement "seriously affected the fairness . . . of the judicial proceedings" because the "record [wa]s littered with testimony" illustrating the defendant's animosity towards non-Muslims).

Defendant nonetheless argues that the special findings are impermissible because the relevant sentencing enhancement, which requires the Government to secure a jury finding of the defendant's hate crime motivation, is generally unavailable in Section 875(c) cases. (Dkt. # 34 at 2, 5–7.) Section 3A1.1(a) provides:

> If the finder of fact at trial or, in the case of a plea of guilty or *nolo contendere*, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by 3 levels.

U.S. Sent'g Guidelines Manual § 3A1.1(a) (U.S. Sent'g Comm'n 2025). The application notes further explain that Section 3A1.1(a) "applies to offenses that are hate crimes." Id. § 3A1.1 cmt. n.1. Relying on this commentary, Defendant argues that the hate-crime-motivation enhancement only applies in cases where proof of such motivation is inherently intertwined with the required proof for the underlying offense. (Dkt. # 34 at 5.)

It appears that the Fifth Circuit has not addressed whether the Section 3A1.1(a) sentencing enhancement is appropriate in cases involving Section 875(c) as the charged offense.[3] The Government has directed the Court's attention to courts outside the Fifth Circuit that have applied this sentencing enhancement to Section 875(c) convictions. See United States v. Barnes, No. 2:23-CR-00097-JAW-1, 2025 WL 1707677, at *1 (D. Me. June 18, 2025); United States v. Jiang, No. 1:24-CR-65 (RDA), 2025 WL 419531, at *12 (E.D. Va. Feb. 6, 2025); United States v. Taubert, 810 F. App'x 41, 43, 45 (2d Cir. 2020); Crosby v. United States, No. 2:11-CR-00023-GZS, 2015 WL 1457430, at *9 (D. Me. Mar. 30, 2015). The Government also identifies opinions—including one from this Circuit—that have upheld a Section 3A1.1(a) enhancement for offenses that are *not* hate crimes, although the Court acknowledges these decisions were not made in the same procedural posture presented here (a pretrial motion to strike surplusage). See United States v. Horsting, 204 F. App'x 441, 442, 444–45 (5th Cir. 2006) (upholding Section 3A1.1(a) enhancement for conviction of assault with a deadly weapon); see also United States v. Houghtaling, 390 F. App'x 604, 605–06 (7th

[3] Defendant cites as persuasive authority another case in this District involving similar facts and legal issues in which the Court granted the defendant's motion to strike surplusage—a special finding alleging religious hostility—from the indictment. See Pretrial Conference Order, United States v. Burger, Case No. 1:25-cr-00332-ADA, Dkt. # 138 at 2. That order, however, does not include any reasoning explaining the basis for the Court's decision, and thus this Court does not find it persuasive here.

Cir. 2010) (upholding Section 3A1.1(a) enhancement for conviction under 18 U.S.C. § 876(c)); In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 151 (2d Cir. 2008) (upholding Section 3A1.1(a) enhancement for conviction of conspiracy in case involving acts of terrorism).

Based on the available authorities, which are relatively sparse, the Court is not persuaded by Defendant's argument that it must strike the Indictment's special findings because Section 875(c) does not require proof of hate crime motivation. Nor is the Court persuaded by Defendant's argument to strike the special findings as unnecessary surplusage because they would not alter the authorized sentence, which is statutorily capped at five years' imprisonment. See 18 U.S.C. § 875(c); Dkt. # 34 at 4. Should this case proceed to a sentencing phase, in order for the Government to seek the Section 3A1.1(a) enhancement it must have already secured a jury finding *permitting* that enhancement. See U.S. Sent'g Guidelines Manual § 3A1.1(a). For this reason, it is better for Defendant to have notice of religious-hostility evidence the Government may offer at trial, especially if Defendant would not expect such evidence because it is not ordinarily required to secure a Section 875(c) conviction.

Lastly, the Court will note, as other courts have, that it could mitigate any prejudicial effect of the Indictment's special findings by instructing the jury that statements in the Indictment are not evidence of guilt. See, e.g., Jiang, 2025

WL 419531, at *12; United States v. Edwards, 72 F. Supp. 2d 664, 667–68 (M.D. La. 1999). Put simply, "[t]his jury, as all juries, will have to follow the actual evidence in the case and the law as provided by the Court" when deciding whether to find Defendant guilty of the charged offense. United States v. Belt, No. CRIM. 1:07-10018, 2010 WL 4106709, at *1 (W.D. La. Oct. 8, 2010).

For the foregoing reasons, the Court DENIES Defendant's Motion to Strike Surplusage (Dkt. # 34).

## II. Motion to Dismiss Indictment—True Threats

### A. Legal Standard

Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Federal Rule of Criminal Procedure 12(b)(3) then provides that a defendant may challenge in a pretrial motion a "defect in the indictment or information," including the "failure to state an offense." Fed. R. Crim. P. 7(12)(b)(3)(B)(v). Whether a pretrial motion to dismiss an indictment can be determined without a trial on the merits depends on "whether the infirmity in the prosecution is essentially one of law or involves determinations of fact." Burger, 170 F.4th at 402–03 (quoting United States v. Flores, 404 F.3d 320, 324 (5th Cir. 2005)).

Although the First Amendment generally prohibits restrictions on the content of speech, those protections are "not absolute" and the government "may regulate certain categories of expression" when the value of the speech is "clearly outweighed by the social interest in order and morality." Virginia v. Black, 538 U.S. 343, 358–59 (2003) (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 383 (1992)). One category of speech that is historically excepted from constitutional protection is "true threats," which are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Id. at 359. True threats are distinguishable from "jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." Counterman, 600 U.S. at 74 (quoting Watts, 394 U.S. at 708).

Thus, as discussed previously, a "statement is a 'true threat' when: (1) 'an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm'; and (2) 'the speaker was subjectively aware of [the statement's] threatening nature.'" Burger, 170 F.4th at 401 (alteration in original) (quoting Jubert, 139 F.4th at 490–91).

B. Analysis

Defendant maintains that the Indictment fails to state an offense because each of the counts is based on constitutionally protected language. (See

Dkt. # 39 at 6.) Defendant's primary argument is that his statements are not true threats as a matter of law because they contain hyperbolic, conditional language that could not reasonably be understood as a serious expression of intent to cause harm. (Id. at 9–13.) In support, Defendant emphasizes that his threats did not identify a particular victim or specific location for any planned attack. (Id. at 8–10.) He also points out that some of the threats are preceded by conditional language, including, "as soon as I get an organized group of men willing to act" and "[i]f I'm NEVER getting a family or a house in shithole America." (Dkt. # 27.)

The Government responds that Defendant's statements are sufficiently direct and specific enough for a reasonable person to believe Defendant intended to act on his threats of violence. (Dkt. # 41 at 6–8.) The Government also argued at the hearing that Defendant had control over any alleged "conditions" that had to occur before carrying out his threats, which distinguishes this case from other true-threats cases involving conditional threats that were premised on events outside the defendant's control. (September 3, 2026 Hearing.) Moreover, the Government contends that the parties' competing interpretations about whether Defendant's posts contained serious threats of violence illustrate that this matter should be resolved by a jury after a trial on the merits, not by this Court on a pretrial motion. (Id. at 10–11.) In support, the Government relies on the Fifth

Circuit's recent decision in United States v. Burger. See 170 F.4th at 403 ("Whether a statement is a true threat is generally a question for the jury.").

In Burger, the Fifth Circuit reversed the trial court's dismissal of an indictment on similar facts as those presented here—the defendant was charged with violating Section 875(c) and he sought to dismiss the indictment on the basis that it prosecuted true threats. Id. at 396, 400. The Fifth Circuit explained that "whether [the defendant]'s statements were 'true threats' could not properly be resolved pretrial under Rule 12" because the case involved "disputed questions of fact" that needed to be determined by a jury. Id. at 401. The context of that conclusion was that the defendant made threatening communications while using character avatars on a virtual gaming platform. See id. at 397–400, 405.

Noting Burger's emphasis on the importance of context, see id. at 402, Defendant relies heavily on the factual distinction that the threats in Burger were made while the defendant was participating in a role-playing game. Defendant thus argues his case is different because the factual context here is undisputed—the parties agree that Defendant posted the statements quoted in the Indictment on the public platform Gab. Further, Defendant argued at the September 3, 2026 hearing that those statements should not be viewed in isolation but rather in their broader context: the more than 100,000 posts Defendant had made since creating his Gab account in 2018.

As an initial matter, the Court acknowledges that courts have concluded that some communications are constitutionally protected as a matter of law, such as when no reasonable jury could interpret the communication as conveying a serious expression of intent to cause violence. See, e.g., United States v. Stock, 728 F.3d 287, 297–98 (3d Cir. 2013) (noting that "a court may conclude that a communication does not constitute a threat as a matter of law in certain cases"); United States v. O'Dwyer, 443 F. App'x 18, 19–20 (5th Cir. 2011) (upholding dismissal of indictment because "no reasonable jury" could find the defendant's statements, "suppose I become 'homicidal'?" and "a number of scoundrels might be at risk if I DO become homicidal," to be true threats); see also United States v. Francis, 164 F.3d 120, 123 n.4 (2d Cir. 1999) (distinguishing the preliminary legal question of "whether a defendant's communication is a true threat rather than speech protected by the First Amendment" from "the question of whether a reasonable person would interpret the communication as a true threat," which is a "question for the jury").

In this case, as in Burger, a jury is needed to resolve contested factual issues. Although the parties agree on basic facts like who made the statements, what they said, and to whom they were communicated, the parties genuinely dispute whether the statements could reasonably be interpreted as threats. Cf. Burger, 170 F.4th at 405–06 (reversing dismissal of indictment because the true

threats "analysis would be materially incomplete without further evidence, particularly the testimony of the two tipsters" who reported the defendant's threats and could offer their perspective on whether they felt threatened). This disagreement carries weight because Defendant's threats do contain some language that could be viewed as hypothetical, abstract, or conditional. The role of the factfinder will thus be crucial in determining whether such hyperbolic language, when paired next to more direct language like "[w]e are going to fucking kill you," "convey[s] a real possibility that violence will follow." Counterman, 600 U.S. at 74.

Here, at least *some* viewers of Defendant's Gab posts found their content alarming because viewers reported the posts in online tips to the FBI. See Dkt. # 1 at 3–6; see also Burger, 170 F.4th at 405 (explaining that "reactions of the recipients of a threat can be useful in determining whether an objectively reasonable person would interpret a statement as a threat"); Watts, 394 U.S. at 708 (considering "the reaction of the listeners" in the true-threats analysis). For this reason, as well as those explained below, the Court disagrees with Defendant's contention that his statements are constitutionally protected as a matter of law.

The Court is also not persuaded that Defendant's statements are protected because they are mere hyperbolic expressions of frustrations with the current political environment. Of course, it is a bedrock principle of the First

Amendment that citizens may criticize their government. See Watts, 394 U.S. at 708. And some statements expressing political hyperbole, such as a mere "offhand comment during a political rally," may not be serious and direct enough to warrant classification as a true threat. United States v. Muller, No. 25-10429, 2026 WL 737343, at *2 (5th Cir. Mar. 16, 2026) (citing Watts, 394 U.S. at 708). It is also true that other cases feature true threats that identify a more specific target victim or precise location than the threats made here. See, e.g., Nformangum, 2026 WL 18900 at *2 (explaining that defendant "individually targeted and threatened Senator Cruz, [and] his family, with knowledge of where he lives"); United States v. Perez, 43 F.4th 437, 443–44 (5th Cir. 2022) (concluding defendant's statement was not protected where it identified a particular grocery store as the target of the threat).

Even so, for purposes of the First Amendment question, the Court finds that the statements made by Defendant fall within the true threats category. The fact that a statement contains political content does not mean it cannot constitute a threat. Muller, 2026 WL 737343, at *2. Nor does a statement need to define a specific target—or be directed to an intended victim—to be interpreted as threatening. See Perez, 43 F.4th at 444 (explaining that true threats do not "turn[] on whether a speaker names individuals or merely places them where those individuals are likely to be"); Morales, 272 F.3d at 288 ("The language of [Section]

875(c) does not require that the threat be made directly to the intended target."); see also United States v. Miah, 120 F.4th 99, 107–08 (3d Cir. 2024) (considering the "context and totality of circumstances of the communications" in determining that that defendant's statements could reasonably be interpreted as true threats). The Fifth Circuit has explained that a "threat's lack of particularity is relevant only insofar as it tends to negate an assertion that an objectively reasonable listener would conclude that threatened violence will occur." Burger, 170 F.4th at 402. Applied to this case, the Court finds that reasonable people could interpret Defendant's statements as seriously expressing an intent to commit violence against Jewish persons and government employees. His failure to name any one individual victim or a specific location, such as by referencing a particular synagogue, does not place Defendant's clear threats to injure others[4] in the realm of constitutional protection.

Nor does the fact that Defendant here broadcasted his threats to a public audience. See United States v. Goltz, No. 23-10851, 2024 WL 3355355, at

[4] As a reminder, these threats include: "I can pick any synagogue I want and go postal on it," "[A]s soon as I get an organized group of men willing to act on it we are going after your ass zog trash," "[W]e'd hit you again at the funeral," "[Zionists are] criminals and I am going to kill them," "I want [my state representatives] to die so bad . . . I'm looking up what is their schedule, where are they and when so I can potentially kill them," "It's not a joke for me. We are going to fucking kill you," and "You are going to make this deal available to me or I am going to start building bombs." (Dkt. # 27.)

*1 (5th Cir. July 10, 2024) (rejecting the defendant's argument that "statements made on social media cannot constitute threats as a matter of law"). The threshold question is whether Defendant's communications satisfy the definition of true threats—"statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359. Defendant may later persuade a jury to find in his favor based on the conditional language that is present in the threatening communications, but he has not shown at this stage that "no reasonable jury could find the allegedly criminal statement[s] to be true threat[s]." O'Dwyer, 443 F. App'x at 20. Accordingly, this Court declines to take that inquiry out of the factfinder's hands, where it traditionally belongs. See Burger, 170 F.4th at 403 ("Whether a statement is a true threat is generally a question for the jury."); United States v. Daughenbaugh, 49 F.3d 171, 173 (5th Cir. 1995) (same), *cert. denied*, 516 U.S. 900 (1995).

For the reasons stated above, the Court is not persuaded that Defendant's statements cannot constitute true threats as a matter of law. The Court instead finds that Defendant's statements fall within the category of true threats, which are excepted from First Amendment protection. Whether or not a jury will *convict* Defendant upon determining that (1) reasonable people would perceive his statements as threatening and (2) he was subjectively aware of the statements'

threatening conduct, remains to be seen. See Nformangum, 2026 WL 18900, at *2 (explaining the "twofold" inquiry stated above for determining whether a defendant transmitted a true threat in a Section 875(c) case).

The Court thus turns to Defendant's final argument for dismissing the Indictment—that Section 875(c) is unconstitutionally vague and overbroad.

III. Motion to Dismiss Indictment—Vagueness and Overbreadth

A. Legal standard

A statute is void for vagueness when it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" and "encourages arbitrary and erratic arrests and convictions." Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972) (citations omitted). A party who claims that a law is void for vagueness "bears the weighty burden of demonstrating that the law is 'impermissibly vague in all of its applications.'" La Union del Pueblo Entero v. Abbott, 167 F.4th 743, 756 (5th Cir. 2026) (quoting McClelland v. Katy Indep. Sch. Dist., 63 F.4th 996, 1013 (5th Cir. 2023)). And a court construing such a claim "must indulge a presumption of constitutionality" in favor of the challenged statute. Id. (quoting United States v. Anderson, 901 F.3d 278, 283 (5th Cir. 2018)).

By contrast, a statute is facially overbroad when "a substantial number of its applications are unconstitutional." Perez, 43 F.4th at 443 (citation omitted);

see also Black, 538 U.S. at 363, 365–66 (concluding that a cross-burning statute was unconstitutionally overbroad because it allowed *any* instance of cross burning to serve as evidence of intent to intimidate others). The Fifth Circuit has explained that "facial challenges of this sort can succeed only if there is a significant imbalance between the protected speech the statute should not punish and the unprotected speech it legitimately reaches." Shackelford v. Shirley, 948 F.2d 935, 940 (5th Cir. 1991).

B. Analysis

As an alternative to his true threats argument, Defendant contends that the Indictment should be dismissed because Section 875(c) is unconstitutionally vague and overbroad. (Dkt. # 39 at 13.) Regarding vagueness, Defendant argues that Section 875(c) is facially unconstitutional because it does not textually include a scienter requirement, so ordinary individuals have no notice of what speech is prohibited under the statute. (Id. at 14.) Defendant further argues that the requisite mens rea of recklessness that courts have applied in Section 875(c) cases does not remedy its vagueness problem because it risks prosecution of purely political speech. (Id. at 14–15.)

The Government responds that Section 875(c) puts individuals with ordinary intelligence on notice that "it is illegal to transmit threats in interstate or foreign commerce to injure the person of another." (Dkt. # 41 at 12.) The

Government further argues that Section 875(c)'s mental state requirements—knowledge that one transmitted a communication and at least a conscious disregard of a substantial risk that one's words will be perceived as threatening—mitigates any vagueness concerns associated with Section 875(c)'s application.[5] (Id. at 12–13.)

On this point, the Court agrees with the Government. Ordinary people can understand upon reading Section 875(c) that it is unlawful to transmit in interstate or foreign commerce a threat to injure or kill another person. And this Court is not alone in reaching this conclusion. See United States v. Sutcliffe, 505 F.3d 944, 953–54 (9th Cir. 2007) (concluding that Section 875(c) is not impermissibly vague because "[a]n ordinary citizen can understand what is meant by the terms 'threat to kidnap' and 'threat to injure,'" and because "the statute provides sufficient standards to allow enforcement in a nonarbitrary manner" (quoting 18 U.S.C. § 875(c))). Additionally, the Court is persuaded that the mental state requirements attendant to a Section 875(c) conviction mitigate concerns that individuals will be prosecuted for statements containing threatening content of which they are not aware, thereby narrowing the reach of the statute. Cf. Miah,

[5] The Indictment alleges, with respect to each count listed, that Defendant made the statement "for the purpose of issuing a threat, with knowledge that the communication will be viewed as a threat, and recklessly disregarding a substantial risk that his communication would be understood as a threat." (Dkt. # 27.)

120 F.4th at 107–08 (noting that Section 875(c)'s "subjective component alleviates concerns that 'a defendant will be convicted for an action that he or she committed by mistake'" (quoting United States v. Fullmer, 584 F.3d 132, 152 (3d Cir. 2009))). In 2023, the United States Supreme Court clarified—in the context of a criminal statute—that a mens rea of recklessness is sufficient for purposes of establishing that someone communicated a true threat. See Counterman, 600 U.S. at 73, 79. Since that decision, the Fifth Circuit has consistently applied the same standard in cases where Section 875(c) is the charged offense. See Nformangum, 2026 WL 18900, at *4–5; Burger, 170 F.4th at 404. These authorities provide sufficient basis for this Court to conclude that the standard of recklessness is sufficient here.

Similarly unavailing is Defendant's argument that Section 875(c) is facially overbroad. Defendant contends that Section 875(c) prohibits or chills a substantial amount of protected speech because it would include statements, like Defendant's in this case, that simply express frustration with the current political environment. (Dkt. # 39 at 15–16.) The Government disagrees and argues that Section 875(c) permissibly protects the public from people like Defendant who knowingly make statements with subjective awareness that those statements will cause others to feel threatened.

Given the evidentiary requirements the Government must satisfy in order to secure a conviction under Section 875(c)—most notably, the mental state

requirements—the Court does not agree that Section 875(c) results in a substantial number of unconstitutional applications. As mentioned, the Fifth Circuit recently emphasized that Section 875(c) "only reaches a 'true threat,'" which is *by definition* speech that is excepted from constitutional protection. Nformangum, 2026 WL 18900, at *2 (quoting Morales, 272 F.3d at 287); see also Counterman, 600 U.S. at 78 (explaining that a subjective element is required in true-threats cases precisely to avoid "chill[ing] too much protected, non-threatening expression"). Further, beyond citing his own statements from the present case, Defendant fails to provide the Court with specific examples of protected speech that he contends falls within Section 875(c)'s ambit. (Dkt. # 39 at 15–16.) For this reason, Defendant has not demonstrated "a realistic danger" that Section 875(c) "will significantly compromise recognized First Amendment protections of parties not before the [c]ourt," which is the required showing when a party claims that a statute is facially overbroad. Shackelford, 948 F.2d at 940 (alteration in original) (quoting City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984)). The Court thus finds that Defendant has failed to meet his burden to demonstrate that Section 875(c) is unconstitutionally overbroad.

Having concluded that Section 875(c) is neither unconstitutionally vague nor overbroad, the Court DENIES Defendant's Motion to Dismiss Indictment (Dkt. # 39).

CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Strike Surplusage (Dkt. # 34) and Motion to Dismiss Indictment (Dkt. # 39).

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, September 14, 2026.

David Alan Ezra
Senior United States District Judge